. 622 P.2d 266

**William R. LUX, Plaintiff-Appellee,**

v.   .

**The BOARD OF REGENTS OF NEW MEXICO HIGHLANDS UNIVERSITY and Ben Roybal, Benny Flores, Orlando Ortiz, Alex Sanchez, Tom Wiley, Its Members; Frank Angel, Its Former President; John Aragon, Its Current President; in their individual and official capacities, Defendants-Appellants.**

**No. 4285.**

Court of Appeals of New Mexico.

Nov. 18, 1980.

Arturo G. Ortega, Michael D. Busta-mante, Albuquerque, for defendants-appellants.

Jerry Wertheim, John Wentworth, Steven L. Tucker, Jones, Gallegos, Snead & Wertheim, Santa Fe, for plaintiff-appellee.

OPINION

HERNANDEZ, Judge.

This case stems out of the non-renewal of the contract of plaintiff, a tenured professor, as Assistant Academic Dean and Director of Title III programs. Plaintiff brought suit against the Board of Regents of New Mexico Highlands University, the members individually, the former President Frank Angel and the current President John Aragon. Plaintiff alleged violations of his rights under the First and Fourteenth Amendments to the United States Constitution and violation of Title 42 U.S.C.A. § 1983, as well as deprivation of his due process rights and rights of equal protection under the New Mexico Constitution. The jury returned a verdict in favor of plaintiff against only one of the defendants, Frank Angel (hereinafter Angel).

Plaintiff was hired as a professor of Southwestern history in 1971. He was granted tenure a year later. Plaintiff was employed in the capacity of Assistant Academic Dean, Director of Title III programs and Associate Professor of History for the summer of 1972 and for the 1972–73 school year. The specific Title III program which plaintiff was to direct was a three year grant from 1972 through the 1974–75 school year. During the 1973–74 school year disagreements developed between plaintiff and Angel concerning the Title III program.

Student dissatisfaction with the program led to a student takeover of the administrative offices in September, 1973. Angel then directed plaintiff to report to the Board of Regents on the program and on the student situation. Plaintiff appeared before the Regents in October, 1973, and gave a prepared speech which was described as "very critical of the administration of Highlands University" in the official minutes of the meeting. Angel began assuming more control over operation of the Title III program and in August, 1974, he reorganized the program and placed plaintiff as head of a university-wide committee selected to administer the program. Plaintiff felt that Title III requirements were being violated, and in June, 1975, sent a letter to the Regents which was highly critical of the

program administration. On July 31, 1975, President Angel informed Lux that his employment as Assistant to the President and Director of Title III would not be renewed and so would terminate on August 31, 1975. Plaintiff's employment as a history professor at Highlands was continued.

In district court, defendants filed a motion for summary judgment; the motion was granted as to the Board of Regents and President Aragon, reserving the issue of a de facto tenure claim advanced by plaintiff. Summary judgment as to Angel was denied. Defendants moved for a directed verdict at the close of plaintiff's case in chief, and it was granted as to the de facto tenure claim. The court denied a directed verdict on all other claims. At the close of all evidence, defendant Angel again moved for a directed verdict on the basis that plaintiff had failed to carry his burden of proof on all issues. The motion was denied. The verdict was for plaintiff; Angel's motions for judgment n.o.v. and for a new trial were denied.

Plaintiff's first contract with the University, in the dual capacity of professor and administrator, read as follows:

NEW MEXICO HIGHLANDS UNIVERSITY

Las Vegas, New Mexico

NAME    Dr. William R. Lux

In accordance with the Statutes of the State of New Mexico and the Bylaws and regulations of the University Board of Regents, you are hereby appointed, in  probationary  status, Assistant Academic Dean (Director of Title III) and Associate Professor of History *
at New Mexico Highlands University from _____ September 1 , 1972, to  September 1 , 1973, for  12  months' services, payable in  12  monthly installments of  $1,583.33 each. ($19,000 per annum)

You will be required to teach at least nine quarter hours per year.

The tenure policy of New Mexico Highlands University, printed on the back of this form, is a part of this contract. Years of credit in other institutions allowed on five-year probationary period:  Three

This agreement cancels all other existing agreements for the period and services covered, and your acceptance hereof is indicated by your signature below. This written acceptance, to be effective, is to be received in the office of the President within  ten  days of the date of approval given below, unless an extension of time is given in writing by the President.

Signature of Appointee:

s/ William R. Lux

Date of Acceptance:

May 22, 1972

APPROVED: Frank Angel
President of the Univ.
Date of Approval  5/22/72

Acct. No.   211–202 – $ 3,400
834–201 – $15,600
(Title III)

It will be noted that plaintiff's teaching duties were specified and that his salary came from two separate accounts, part for his duties as an instructor and part for his duties as an administrator. The phrase "in probationary status" refers to his status as a member of the faculty. On the reverse side of this contract form were printed the regulations concerning tenure of faculty members and they provide in this regard: "All other new appointments shall be probationary. Probationary appointments shall be for one year, renewable year by year for a five-year period." Earlier that same year, April 17th, plaintiff had been given a contract as "Associate Professor of History" alone and that phrase was in that contract. Plaintiff's contract for the period from September 1, 1974 to August 31, 1975, read as follows:

NEW MEXICO HIGHLANDS UNIVERSITY

Las Vegas, New Mexico

NAME   Dr. William R. Lux

In accordance with the Statutes of the State of New Mexico and the Bylaws and Regulations of the University Board of Regents, you are hereby appointed, in permanent status, Associate Professor of History; Director of Title III, Assistant to the President for Planning and Development at New Mexico Highlands University from Sept. 1, 1974, to August 31, 1975, for 12 months' services, payable in 12 monthly installments of $1,833.33 each ($22,000 per annum)

The tenure policy of New Mexico Highlands University, printed on the back of this form, is part of this contract. Years of credit in other institutions allowed on five-year probationary period:   On tenure

This agreement cancels all other existing agreements for the period and services covered, and your acceptance hereof is indicated by your signature below. This written acceptance, to be effective, is to be received in the office of the President within   10   days of the date of approval given below, unless an extension of time is given in writing by the President.

Signature of Appointee:   APPROVED: Frank Angel

President of Univ.

s/ William R. Lux

Date of Acceptance:   Date of Approval 9/16/74

9/16/74   Account No. 834–201  –  $11,000

251–201  –  $11,000

■ The law applicable to the alleged deprivation of plaintiff's liberty interest is as follows:

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of hearing is paramount. But the range of interests protected by procedural due process is not infinite.

\* \* \* \* \* \*

But, to determine whether due process requirements apply in the first place, we must look not to the "weight" but to the *nature* of the interest at stake. [Citations omitted.] We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.

\* \* \* \* \* \*

While the Court has not attempted to define with exactness the liberty \* \* \* guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life \* \*

\* \* \* \* \* \*

There might be cases in which a State refused to reemploy a person under such circumstances that interests in liberty would be implicated.

*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Subsequent lower court decisions have interpreted the guidelines articulated in *Roth* to require that an employee claiming an infringement of liberty show that the government's action was likely to either seriously harm his standing in the community or foreclose his future opportunities for reemployment." *Mazaleski v. Treusdell*, 562 F.2d 701 (D.C.Cir.1977). "But not every remark which may arguably affect one's reputation violates due process if made by a government official without a hearing, for the fourteenth amendment protects only against charges that 'might seriously damage [one's] standing and associations in his community.'" *Lipp v. Board of Education*, 470 F.2d 802 (7th Cir. 1972). "To infringe one's liberty, the effect of government action on future employment must extend beyond a disadvantage or impediment; it

must 'foreclos[e] his freedom to take advantage of other employment opportunities.'" *Mazaleski v. Treusdell, supra.*

■ The statements made by Angel which plaintiff claims seriously damaged his standing and reputation as professor and administrator are the following: From a three-page memorandum dated July 10, 1973, sent by Angel to two members of the Board of Regents, the part pertaining to plaintiff reads as follows: "Now it appears that [the Chicano organization on campus] has fractionized [sic], with La Raza Unida group dominating. * * * Two professors, Pedro Rodriguez and Bill Lux, are probably the real behind-the-scenes leaders. Pedro especially is a behind-the-scenes manipulator. He never openly shows his claws." A draft of a letter addressed to a Dr. Player, which was never sent, a copy of which was given to Dean McGahan, professor of Botany and Academic Dean, in pertinent part reads as follows:

(Angel's personal handwritten note at top of page) "Marie's file for future references *confidential*"

DRAFT:

Letter to Dr. Player:

I am writing this letter to you because I know of no other recourse and am seeking advice.

We have a Title III grant for 1973–74 for $500,000. A grant which can make significant contributions to the development of this institution.

A year and a half ago we appointed Dr. William Lux, a Chicano professor in the History Department, as Director of Title III and, in an effort to bring Title III programs into the mainstream of the University, we also added the title of Assistant Academic Dean.

The original budget sheets were submitted by Dr. Lux early in the Summer and approved. However, they were never discussed with me and, as chief administrator officer, I am deeply concerned with grants especially one which amounts to nearly 25% of our state appropriation.

When the budget was finally brought to my attention in late summer I discovered Dr. Lux had inflated administrative costs, by assigning himself an executive secretary (which, in our type of organization is a level of secretary assigned only to the President) and an administrative assistant which is a position not approved for any administrator, including the President. Furthermore, there were errors in calculation and almost nothing for evaluation which we consider critical.

The following are some of the factors that have gone into this problem:

1. There is, on the campus and the community, a very small (50–60) group of extremist Chicanos who have a narrow, self-serving, concept of Chicanismo. They have the idea that this institution should become entirely Chicano and that I, because I am a Chicano, should yield to their demands. There are many reasons why I cannot and will not. Because they have access to the operation of Title III through Dr. Lux, who is their behind-the-scenes leader, they are using the program as a symbol. Incidentally, there have been repeated and substantial expressions of support for me and my administration from a majority of the students, the faculty, and the community.

2. Because of my inability to trust Dr. Lux I wrote to Ms. Dickerson that I, personally, would be the official signatory and contact person for all matters concerning Title III. In spite of this, there is very good evidence, although denied, that Ms. Dickerson and Dr. Lux are still in contact with each other on matters concerning Title III.

3. Dr. Lux has assumed that the title of Director has given him virtual autonomous authority overall [sic] Title III monies and program. A procedure not accepted in this University for any program.

3. [sic] As a result of the above I told Dr. Lux that he would be a "coordinator" and not a "Director" of Title III. At this point he made an implied threat of legal action because his contract has the latter title. This is not important because I can redefine duties as they will best benefit the University.

4. Dr. Lux publicized this change of Title III and, by distorting the implications of it contributed to the resignation of the Coordinator of Chicano Studies on August 26—three weeks before the fall term began. We are still without a coordinator. Incidentally, Dr. Lux also distributed copies of correspondence between me and Ms. Dickerson concerning administrative reorganization to the protesting students.

5. The rumor soon became current that I had destroyed Chicano Studies, this in spite of the fact that we still have a major and about 30 courses in the current catalogue. This I lay at Dr. Lux' door because of the distortation he propograted [sic].

6. Not long after this, the 45–50 activist Chicano students occupied my office, 41 of whom had to be removed by the State Police. They demanted [sic] that I, Dr. Sanchez, Dean McGahan and one other administrator resign and among other things that the former administration of Title III be restored—i. e. that Dr. Lux be given free rein.

7. After several earlier meetings, the Regents met the day before yesterday to attempt to resolve many problems. At the meeting, Dr. Lux made a vicious attack on me and on my efforts to make Title III responsible. I am enclosing a newspaper account in order thay [sic] you may have some objective picture of the situation which is extremely complex. At the meeting I made the statement that I would again call Ms. Dickerson in the morning to try to get an answer.

8. The following morning (yesterday) Ms. Dickerson called me concerning my budget requests and gave partial approval. Coincidence? Possibly. But based on my experience with Dr. Lux, I am morally certain, that he called her—I had tried earlier to call her a number of times but she was always in conference. You may wonder why I don't terminate Dr. Lux. He is a tenured member of the faculty and has a contract as an administrator. Experience has shown us that when a champion of militant dissidents is terminated the court battles and intra-university hearings are so traumatic that it is better to live, at least for the rest of the year, with a bad situation.

Assuming, but not deciding, that these statements impugned plaintiff's good name and reputation, they still cannot form the basis of a claim because they were not made public. "A communication which is not made public 'cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor or integrity" was thereby impaired.' *Bishop v. Wood*, 426 U.S. 341 [96 S.Ct. 2074, 48 L.Ed.2d 684] * * * (1976)." *Lyons v. Sullivan*, 1 Cir., 602 F.2d 7 (1979). The communication between Angel and two of the Regents was obviously made in furtherance of Angel's duty of keeping them informed of conditions at the university. The Regents definitely had an interest in receiving the information to aid them in making necessary decisions concerning the governance of the university. It is readily apparent from the nature of the subject matter and the candidness of the statements that they were made in confidence. Likewise, the draft of the letter given by Angel to the Academic Dean concerned matters in which both had an interest as part of their duties as administrators. The relationship of the personal secretary to the chief administrative officer of such an institution as the university is that of principal and alter ego and it is implicit in such a relationship that all communications are confidential. These statements did not impair plaintiff's "liberty" interests because they were not made public, and so could not affect plaintiff's reputation or employability in the community.

■■ Examining next the "free speech" issue: this involves the statement read by plaintiff to the Board of Regents at their meeting of October 15, 1973. We quote it in its entirety because it does not lend itself to being condensed.

(Speech Before New Mexico Highlands University Regents, October 15, 1973).

Gentlemen: One year ago I briefly addressed the New Mexico Highlands facul-

ty at its first meeting of the academic year and stated that I intended to determine for myself whether or not the Angel administration truely [sic] represented scholarship and academic excellence. Now, because of what I have witnessed in the last fifteen months, I can assert that this university—THE POLITICAL UNIVERSITY PAR EXCELLENCE—precludes any such possibility. Intellectual dishonesty and hiprocracy [sic] that characterizes it are self-indicting. The example of the suppression of Ethnic Studies is not untypical.

Despite dogmatic statements to the contrary we do not have an Ethnic Studies, which includes Chicano Studies, Department; we do not even have the nascent program efforts of last year. All that remains is a major on the books and the regular courses offered by various departments that can count as electives. *Academic advisement, program planning and implementation, cultural heritage are all eliminated, while every other arrangement in Title III functions except Ethnic Studies.* This is all so unnecessary because the funding is there—it has been since last June! The Ethnic Studies program is budgeted for nine full-time staff and we would have them if this administration would cease its unconscienceable [sic] impoundment of funds.

Our former friends in the Office of Education have been appalled by all of this. These are people who want very much to see Highlands succeed and who are now extremely disappointed with all of this political mess. Highlands was scheduled for $3–4 million out of the advanced Title III money over the next three years. Because of the inept clumsy machinations that have characterized this administration since June, I doubt seriously that any money will be forthcoming. Then *who* will be hurt? All the minorities hired on soft money which the administration so proudly waved before the LUSC last week. If anyone here doubts what I am saying, I suggest we call in the program auditors of the Office of Education and begin an audit.

The multi-cultural cop-out is another way for apologizing for incompetence and a lack of professional ability. Or was professionalism ever the real objective? Actually, to seriously educate young citizens in the societal values of all cultures was no more than a gimmick to divert attention. What Las Vegas *has* prescensed [sic] in the last two years, with Highlands as the basis for patronage, is the establishment of a second political machine. Composed of two basic types: psuedo-intellectuals (actually hack politicians), and supposed bleeding-heart WASPS who in reality are street walkers who have prostituted themselves and whatever scrupples [sic] they might have had to play token Anglo. This conglomerate has determined to consolidate political controls through absolute stifling of dissent and regimentation that would evoke envy in the Kremlin. To just stand here before you placed Pedro Rodriguez' job in jeopardy last summer. Two of you just after he dared talk to you received that scathing and unprovoked attack by the president. And now where is Rodriquez?

All the while pious pronouncements and promises emanate from the institution in an attempt to win the respect of the community. If this administration is not respected—it is *because it has not earned it.*

This community cannot forget that it came to a regents meeting last summer and asked that the Highlands administration resolve its internal problems. But insensitivity prevailed and the issue was tabled. Now, Highlands' fanny is in the fire and its seeks community sanction for its *fascistic* actions. But community confidence is destroyed. And it will take more than an *Optic* photo of four grinning clowns on bicycles to reestablish it.

This lack-luster administration has distinguished itself by its incredible mediocrity. It is morally and ethically bankrupt! It is incumbent on you gentlemen, out of deferrence [sic] to the taxpayers of New Mexico, to see that Highlands is

returned to respectability. Gestapo tactics and intransigence will not resolve anything, but only engender further violence. And I predict that this irrational and close-minded attitude of the administration and its high-handedness has put us on the verge of making Las Vegas the Wounded Knee of the southwest.

The law relating to "free speech" has been set forth by the Supreme Court.

"For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

However, for a comment to be accorded constitutional protection it must be upon matters "of legitimate public concern." *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Plaintiff's comments were not made to the public, and only one sentence in plaintiff's speech related to administration of the Title III program at Highlands University. Rather than discussing the Title III program, which might have been a matter of legitimate public interest, plaintiff engaged in vituperation and personal vilification of "the Angel administration." Such a diatribe did not serve to foster rational discourse, exchange of ideas, and meaningful discussion about a matter of legitimate public interest, and it is these functions that "free speech" protections are intended to foster.

The factual situation is not too unlike that in *Clark v. Holmes*, 474 F.2d 928 (7th Cir. 1972).

Clark construes too broadly the extent of his First Amendment rights and thus slights the interest of the State in providing its educational services according to policies it deems proper. * * * His disputes with his superiors and colleagues about course content and counselling were not 'matters of public concern' and involved Clark as a teacher rather than as an interested citizen. * * * Further, Clark has cited no sound authority for his proposition that he had a constitutional right to override the wishes and judgment of his superiors and fellow faculty members * * *.

\*    \*    \*    \*    \*    \*

But we do not conceive academic freedom to be a license for uncontrolled expression at variance with established curricular contents and internally destructive of the proper functioning of the institution. First Amendment rights must be applied in light of the special characteristics of the environment in the particular case.

■ Because plaintiff failed to establish a deprivation of a protected liberty interest, he consequently failed to establish a right to a termination hearing for that reason. Plaintiff contends nonetheless that he was entitled to a termination hearing because of the provisions of the Employment Contract. We do not agree. The pertinent provisions of the contract reads as follows:

> *Regulations concerning Tenure of faculty members of New Mexico Highlands University.*
>
> I. The following tenure regulations are for the purpose of stabilizing the teaching profession, insuring justice to the teaching faculty, securing the progress and welfare of the students, and safeguarding the interests of the supporting public of New Mexico Highlands University.
>
> II. Termination for cause of a permanent appointment and of a tempo-

rary appointment or probationary appointment prior to expiration of a contract shall be considered by both a faculty committee and the Board of Regents. The faculty member facing possible dismissal shall, ten days before the hearing, be informed in writing of the charges against him and shall have the opportunity to be heard in his own defense by all bodies that pass judgment on his case.

As can be seen from the heading and these other provisions, these terms apply to the faculty members in their capacity as instructors. Plaintiff cites the case of Mr. William Jennings, who was dismissed from his position on the faculty and from his administrative position and was afforded a hearing upon request after his dismissal, as evidence for his contention that he was entitled to a pretermination hearing. We do not agree with plaintiff's contention. Mr. Jennings was entitled to a pretermination hearing on his dismissal as an instructor and the Regents, by granting him a post-dismissal hearing, were merely rectifying the omission. Plaintiff was not dismissed from his position as a member of the teaching faculty. He was retained as a tenured professor, unlike Mr. Jennings. Secondly, Mr. Jennings requested the hearing; plaintiff did not.

The trial court erred in not granting defendant's motion for a directed verdict with regard to: The alleged deprivation of plaintiff's right to equal protection under the law; the alleged deprivation of plaintiff's liberty interest; and the alleged deprivation of plaintiff's first amendment rights. Accordingly, the trial court's judgment entered upon the jury verdict is reversed with instructions to vacate the judgment and enter judgment for the defendant.

IT IS SO ORDERED.

LOPEZ and WALTERS, JJ., concur.