1998-NMCA-179

968 P.2d 1182

Tina **MARTIN-MARTINEZ,**
**Plaintiff-Appellant,**

v.

**6001, INC., d/b/a T.D.'s Showclub,**
**Defendant-Appellee.**

**No. 18322.**

Court of Appeals of New Mexico.

Oct. 14, 1998.

Certiorari Denied, No. 25,455,
Nov. 30, 1998.

320

Charles R. Peifer, Cody K. Kelley, Browning & Peifer, P.A., Albuquerque, for Appellant.

Mark Patrick Geiger, Geiger Law Offices, P.C., Albuquerque, for Appellee.

## OPINION

WECHSLER, Judge.

{1} This appeal raises questions concerning the applicability of the exclusivity provisions of the Workers' Compensation Act (Act), NMSA 1978, § 52–1–6(D), (E) (1990) (effective January 1, 1992), § 52–1–8 (1989), and § 52–1–9 (1973). Plaintiff, Tina Martin–Martinez, filed her complaint against her employer, 6001, Inc., and Kenny Blume, a manager at the club, for intentional torts and negligence. The district court granted summary judgment to 6001, Inc. on all claims based on the exclusionary provisions of the Act. In her appeal, Plaintiff argues that: (1) 6001, Inc. engaged in intentional actions toward Plaintiff not compensable under the Act either because Defendant Blume was the alter ego of 6001, Inc., or because the circumstances support a reasonable inference that 6001, Inc. directly intended to harm Plaintiff; (2) the Act does not apply because Blume assaulted Plaintiff after her discharge from employment; and (3) 6001, Inc. waived the exclusivity provisions of the Act. We affirm the grant of summary judgment.

### Facts

{2} Plaintiff was employed by 6001, Inc. as a dancer at TD's Showclub. According to Plaintiff's complaint, at approximately 1:30 a.m. on December 31, 1995, at the end of her shift, Plaintiff noticed that items of her clothing were missing from her locker. She summoned Joe Reese, the manager on duty that night at the club. Kenny Blume, another manager, came into the locker room after Reese and ordered the other employees out of the room while Reese spoke with Plaintiff. Blume then yelled at Plaintiff using obscenities, struck her in the chest, fired her, and ordered her to leave the club. When Plaintiff reached into her locker to remove her personal belongings, Blume slammed the locker door on Plaintiff's hand, breaking a finger. Plaintiff's complaint requests damages from 6001, Inc. and Blume for "past and future expenses, lost earnings, past and future pain and suffering, temporary and permanent imparement [sic], disfigurement, emotional distress, humiliation, and punitive damages" for claims of assault, battery, and negligence of both 6001, Inc. and Blume.

{3} 6001, Inc. filed a motion to dismiss, or, in the alternative, for summary judgment on the grounds that Plaintiff was acting in the course and scope of her employment and that the Act provided the exclusive remedy for Plaintiff's injuries. The district court granted the motion, and Plaintiff appeals.

### Exclusivity Provisions of the Workers' Compensation Act

{4} The exclusivity of the Act's remedies for accidental injuries or death arising out of and in the course of a worker's employment is an underlying policy of the Act. The legislature has expressed this policy in different ways throughout the Act. Under Section 52–1–6(D) the employer and the worker surrender their rights to any other method, form, or amount of compensation or determination on account of personal injuries or death of the worker except as provided in the Act. By virtue of Section 52–1–6(E), a worker may not maintain a cause of action outside the Act against an employer or an employer's representative for any matter relating to the occurrence of or payment of any injury or death covered by the Act. Section 52–1–8(C) provides that an employer which has complied with the Act's provisions relating to insurance is not subject to any other liability for a worker's death or personal injury, and that all statutory and common-law rights and remedies are abolished except as provided in the Act. Finally, Section 52–1–9 sets the employer's obligation to pay compensation in lieu of any other liability when the employer has complied with the Act's insurance provi-

sions, the worker has performed "service arising out of and in the course of his [or her] employment" at the time of the accident, and the worker's "injury or death is proximately caused by [an] accident arising out of and in the course of ... employment and is not intentionally self-inflicted."

{5} Our Supreme Court has considered these statutory provisions to reflect the "legislative balancing" of "the recognized public policy supporting ... exclusivity." *Dickson v. Mountain States Mut. Cas. Co.*, 98 N.M. 479, 480, 650 P.2d 1, 2 (1982). In *Mountain States Telephone & Telegraph Co. v. Montoya*, 91 N.M. 788, 791, 581 P.2d 1283, 1286 (1978), our Supreme Court recognized with approval the analysis currently stated in 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 65.11, at 12-1, 12-12 (1997) (Larsons), that exclusivity "is part of the *quid pro quo* in which the sacrifices and gains of employees and employers are to some extent put in balance, for, while the employer assumes a new liability without fault, he is relieved of the prospect of large damage verdicts."

### 1. *Intentional Acts of Employer*

{6} The *quid pro quo* in which the exclusivity provisions have their genesis does not sanction absolving an employer from its own intentional acts. Consequently, when our appellate courts confront a case in which the employer has acted intentionally or deliberately, our decisions do not impose the Act's exclusivity preclusions. *See Coleman v. Eddy Potash, Inc.*, 120 N.M. 645, 652–53, 905 P.2d 185, 192–93 (1995); *Eldridge v. Circle K Corp.*, 1997–NMCA–022, ¶ 16, 123 N.M. 145, 934 P.2d 1074; *Johnson Controls World Servs., Inc. v. Barnes*, 115 N.M. 116, 118, 847 P.2d 761, 763 (Ct.App.1993). The best rationale for this result, according to Professor Larson, is that it is inconsistent for the employer to argue that "the injury was 'accidental' and therefore was under the exclusive provisions of the [Workers'] Compensation Act, when [the employer itself] intentionally committed the act." 6 Larsons, *supra*, § 68.11, at 13–4.

{7} In the most recent intentional tort case, our Supreme Court held that a district court's dismissal of an employee's claim for damages for the tort of intentional spoliation of evidence, rather than negligent spoliation of evidence, was not barred by the Act's exclusivity provisions. *See Coleman*, 120 N.M. at 653, 905 P.2d at 193. The Court applied the test of "whether the injury stems from an actual intent to injure the worker." *Id.*

{8} This Court has applied the same analysis in addressing exclusivity in the context of a worker's claim for damages based on an intentional tort committed by an employer. *See Barnes*, 115 N.M. at 118, 847 P.2d at 763 (exclusivity provision does not bar common-law action for damages when the injury stems from an actual intent of employer to injure worker); *see also Maestas v. El Paso Natural Gas Co.*, 110 N.M. 609, 612, 798 P.2d 210, 213 (Ct.App.1990) ("[E]mployer must intend to injure an employee before [it] can be held liable outside the Act."); *Gallegos v. Chastain*, 95 N.M. 551, 554, 624 P.2d 60, 63 (Ct.App.1981) (actual intent to injure on the part of employer required to avoid the exclusivity provisions of the Act); *Sanford v. Presto Mfg. Co.*, 92 N.M. 746, 748, 594 P.2d 1202, 1204 (Ct.App. 1979) (actual intent to injure is necessary to justify common-law complaint for damages); *cf. Eldridge*, 1997–NMCA–022, ¶ 26, 123 N.M. 145, 934 P.2d 1074 (workers' compensation administration required to defer to district court to determine jurisdiction of worker's claims for intentional tort).

{9} Plaintiff argues that in *Beavers v. Johnson Controls World Services, Inc.*, 120 N.M. 343, 901 P.2d 761 (Ct.App.1995), this Court expanded a worker's ability to overcome the Act's exclusivity provision to include not only an employer's intentional tort, but also an employer's hired supervisor's intentional tort. Plaintiff misconstrues our holding in *Beavers*. In *Beavers*, the plaintiff had first filed a workers' compensation claim which the workers' compensation judge (WCJ) dismissed because the plaintiff did not raise a compensable claim that her mental disability "arose in connection with disciplinary, corrective, or job evaluation action by her employer." *Id.* at 347, 901 P.2d at 765. The plaintiff testified at the trial of her inten-

tional tort claims that she suffered mental distress because of the conduct of her supervisor. *See id.* at 345, 901 P.2d at 763. The district court dismissed the plaintiff's claim of intentional infliction of emotional distress and submitted the prima facie tort claim to the jury. *See id.* at 347, 901 P.2d at 765.

{10} This Court concluded that the Act's exclusivity provisions did not bar the prima facie tort claim because the WCJ had determined that the plaintiff's mental disability was noncompensable under the Act. *See id.* at 348, 901 P.2d at 766. Indeed, if the Act does not provide a remedy, the exclusivity provisions do not apply because the employer has not relinquished any benefit. *See Russell v. Protective Ins. Co.,* 107 N.M. 9, 12, 751 P.2d 693, 696 (1988) (when cause of action is unrelated to worker's physical or psychological job-related injury, then it is independent from the cause of action contemplated by the Act).

{11} The *Beavers* case is more analogous to other exclusivity cases in which our appellate courts have distinguished cases based upon an employer's intentional tort from those in which the Act's exclusivity provisions may not apply because the worker's claims fall outside the purview of the Act for other reasons. *See Coleman,* 120 N.M. at 652–53, 905 P.2d at 192–93; *see, e.g., Sabella v. Manor Care, Inc.,* 1996–NMSC–014, ¶¶ 17, 19, 121 N.M. 596, 915 P.2d 901 (Act's exclusivity provisions do not bar claims for sex discrimination under New Mexico Human Rights Act because each Act is designed to remedy different injuries); *Michaels v. Anglo Am. Auto Auctions, Inc.,* 117 N.M. 91, 93–94, 869 P.2d 279, 281–82 (1994) (tort of retaliatory discharge addresses wrong distinct from Act); *Hernandez v. Home Educ. Livelihood Program, Inc.,* 98 N.M. 125, 127–28, 645 P.2d 1381, 1383–84 (Ct.App.1982) (Act's exclusivity provisions do not bar claims for injuries suffered when a plaintiff was not acting within the course and scope of her employment).

{12} Due to the noncompensable nature of her injury, the plaintiff in *Beavers* alleged intentional conduct on the part of her supervisor as part of her prima facie tort claim. The allegations of her supervisor's

intentional conduct were not necessary to overcome the exclusivity provisions of the Act; the WCJ had determined she had suffered no compensable injury under the Act. Hence, under the circumstances, the exclusivity provisions did not interfere with her claim of prima facie tort. *See Beavers,* 120 N.M. at 348, 901 P.2d at 766. In the case on appeal, the injuries suffered by Plaintiff are compensable under the Act, therefore *Beavers* does not apply.

### 2. *Alter Ego Theory*

{13} In most instances, the intentional conduct of an employee injuring another employee is not the intentional conduct of the employer. *See Gallegos,* 95 N.M. at 553–54, 624 P.2d at 62–63 (battery of co-worker is not intentional tort of employer). The intentional act of the employee does not become the act of the employer unless the employer expressly authorized, commanded, or committed the act itself. *See id.* at 554, 624 P.2d at 63; *see also* 6 Larsons, *supra,* § 68.21(b), at 13–123. In this case, Plaintiff does not allege that 6001, Inc. expressly authorized, commanded, or committed Blume's acts. The intentional act of an employee can be imputed to the employer, however, if the employee is the alter ego of the employer. *See Coleman,* 120 N.M. at 652–53, 905 P.2d at 192–93; 6 Larsons, *supra,* § 68.22, at 13–128.

{14} The essence of an "alter ego" is a commonality of interest such that the acts of the two parties are deemed to be indistinguishable for a particular purpose. *See generally Levy v. Disharoon,* 106 N.M. 699, 703, 749 P.2d 84, 88 (1988) (when liquidating partner of partnership owned 85% of stock of third-party corporation, for all practical purposes corporation and liquidating partner treated as one and the same); *Salswedel v. Enerpharm, Ltd.,* 107 N.M. 728, 732, 764 P.2d 499, 503 (Ct.App.1988) (noting that when partnership is alter ego of employer partner, they are treated as the same person for purposes of the dual persona doctrine and are not liable in tort); *Lux v. Board of Regents,* 95 N.M. 361, 366, 622 P.2d 266, 271 (Ct.App.1980) ("The relationship of the personal secretary to the chief adminis-

trative officer of [a] university is that of principal and alter ego."). Most commonly, the concept is used in corporate law to describe the relationship between individuals who may be so integrally tied to a corporation so as to remove the shield of corporate status when they are sued individually for what would ordinarily be only corporate obligations. *See Scott v. AZL Resources, Inc.,* 107 N.M. 118, 121, 753 P.2d 897, 900 (1988) (an essential element of the alter ego doctrine to pierce the corporate veil is proof of unity of interest and ownership); *Garcia v. Coffman,* 1997–NMCA–092, ¶ 15, 124 N.M. 12, 946 P.2d 216 (alter ego doctrine requisite to pierce corporate veil); *Harlow v. Fibron Corp.,* 100 N.M. 379, 382, 671 P.2d 40, 43 (Ct.App.1983) (same).

{15} To argue that the exclusivity provisions do not apply to 6001, Inc., Plaintiff submitted her affidavit stating in part:

> Kenny Blume and Joe Reese were the highest ranking managers at the club that night. As a general matter they exercised control over the premises and employees on a regular basis, routinely making decisions about hiring and discharging employees, scheduling, employee time off and the manner in which the business was run. All other employees answered to them and they frequently determined on their own whether or not enforce [sic] particular rules about sending employees home, ejecting patrons, allowing employees to drink, allowing employees to drink for free and allowing patrons to remain after hours.

Defendants rely heavily on Larsons and cases which cite Larsons for the theory that one in the position of store manager should not be considered an alter ego of an employer for exclusivity purposes. Larsons opines:

> The commonest legal argument is that the employer cannot assert that something is accidental that *he* did on purpose. The moral argument is that the employer should not be allowed to assault the plaintiff and then *himself* enjoy financial immunity from suit. The key in both arguments is not agency but identification. When the conduct involved, then, is an impulsive assault, it seems that the position of a person

in even a rather exalted supervisory capacity like that of store manager is more comparable in principle to that of a foreman or supervisor than to that of a dominant corporate owner-officer.

6 Larsons, *supra,* § 68.22, at 13–131 to 13–132.

{16} We believe that, when applied to the circumstances of this case, Larsons' rationale more accurately captures the compromise that underlies the Act. *See Gallegos,* 95 N.M. at 554, 624 P.2d at 63 (" 'When the person who intentionally injures the employee is not the employer in person nor a person who is realistically the alter ego of the corporation, but merely a foreman, supervisor or manager, both the legal and the moral reasons for permitting a common-law suit against the employer collapse.' " (quoting 6 Larsons, *supra,* § 68.21(a), at 13–113 (footnote omitted))).

{17} In this case involving a corporate employer, Plaintiff's affidavit does not state that Blume and Reese had any ownership interest or confidential relationship with the shareholders of 6001, Inc. *See Scott,* 107 N.M. at 121, 753 P.2d at 900. There is no indication that they were shareholders, directors, or officers of the corporation. The affidavit indicates that Blume and Reese were managerial employees of 6001, Inc. with supervisory control over Plaintiff and other employees. But the record does not provide any information about the corporate organization of 6001, Inc. or the level within the corporation at which Blume and Reese were employed. Plaintiff does not raise a genuine issue of material fact as to whether Blume and Reese can be treated as one and the same as, or alter egos of, 6001, Inc.

### 3. *Inapplicability of Managerial Capacity Rule*

{18} Plaintiff would additionally ascribe to 6001, Inc. the intentional acts of Blume and Reese because New Mexico has adopted the rule of managerial capacity. This argument is inapplicable. The rule of the managerial capacity adopted by the Supreme Court in *Albuquerque Concrete Coring Co. v. Pan Am World Services, Inc.,* 118

N.M. 140, 144–46, 879 P.2d 772, 776–78 (1994), relates to punitive damages and provides in relevant part that "[p]unitive damages can properly be awarded against a master or other principal because of an act by an agent if ... the agent was employed in a managerial capacity and was acting in the scope of employment." *Id.* at 145, 879 P.2d at 777 (quoting Restatement (Second) of Agency § 217 C, Subsection (c) (1957) and Restatement (Second) of Torts § 909, Subsection (c) (1977)).

{19} *Albuquerque Concrete Coring Co.* involved a contract dispute between a contractor and subcontractor. *See* 118 N.M. at 142, 879 P.2d at 774. The Supreme Court upheld an award of punitive damages for deceit and misrepresentation because the administrative manager acted in a managerial capacity as the contractor authorized him to manage the subcontractor and make independent decisions binding the contractor corporation. *See id.* at 146, 879 P.2d at 778. The case did not involve an employee and employer.

{20} The Act's statutory scheme and common-law punitive damages based upon managerial capacity redress different wrongs. The applicability of the Act rests upon the public policy of striking a legislative balance between the rights of workers and employers. *See Dickson,* 98 N.M. at 480, 650 P.2d at 2. An employer's liability for punitive damages stands on the premise that "[c]orporate liability for punitive damages should depend upon corporate responsibility for wrongdoing." *Albuquerque Concrete Coring Co.,* 118 N.M. at 146, 879 P.2d at 778. Liability for punitive damages does not equate to non-applicability of the Act. Plaintiff's interpretation would conflict with our legislature's construction of the *quid pro quo* underlying the Act. The statutory provisions prevail. *See Ferguson v. New Mexico State Highway Comm'n,* 99 N.M. 194, 195, 656 P.2d 244, 245 (Ct.App.1982).

*Application of Workers' Compensation Act to Injuries After Discharge*

{21} Plaintiff alternatively argues that even if the exclusivity provisions barred her common-law claims, she may proceed on her theories of negligence and intentional tort for injuries inflicted after her discharge. According to Plaintiff, once the employment relationship was terminated, the limitations of the Act no longer applied.

{22} Although this issue has not been previously addressed in our appellate courts, there is considerable authority in other jurisdictions holding that workers' compensation benefits do not cease the moment the employee is terminated. *See Woodward v. St. Joseph's Hosp.,* 160 Ga.App. 676, 288 S.E.2d 10, 11 (Ga.Ct.App.1981) (" '[T]he act of discharging an employee is an integral part of the employment relationship, making injuries arising out of discharge causally connected to that employment.' " (quoting *Hill v. Gregg, Gibson & Gregg, Inc.,* 260 So.2d 193, 195 (Fla.1972))); *see also* 2 Larsons, *supra,* § 26.10, n. 1, at 5–329 to –332. Professor Larson instructs:

> Compensation coverage is not automatically and instantaneously terminated by the firing or quitting of the employee. He or she is deemed to be within the course of employment for a reasonable period while winding up his or her affairs and leaving the premises.

2 Larsons, *supra,* § 26.10, at 5–329. This rule includes instances, such as this one, in which a terminated worker is assaulted while leaving the work place immediately after termination. *See Hill,* 260 So.2d at 195 (employee assaulted by supervisor after termination covered by workers' compensation act); *cf. Schexnaydre v. M.W. Kellogg Co.,* 343 So.2d 743, 744 (La.Ct.App.1977) (remanded to develop fact to determine if terminated employee who was assaulted was an employee within the scope of employment for purposes of workers' compensation act).

{23} We believe that this rule is logical. Generally, New Mexico follows the "going and coming rule" to the effect that a worker's employment begins when the worker reaches the place of work and ends when leaving the place of work. *See Barton v. Las Cositas,* 102 N.M. 312, 315, 694 P.2d 1377, 1380 (Ct.App.1984). Absent special circumstances, a worker is not covered by the Act when traveling home from the work place.

*See id.* However, the line is drawn at the point of departure from the work place, and not when the worker ends her shift, yet remains at her place of employment to change clothes, an act incidental to her work. *See id.* ("[E]mployment relationship is suspended from the time the employee leaves his work until he returns."); 2 Larsons, *supra*, § 26.10, at 5–332 (in determining a reasonable length of time to wind up affairs, "the allowed interval should be long enough to encompass the incidents that flow directly from the employment, although they may take effect after employment has technically ceased").

{24} In the case on appeal, 6001, Inc. provided Plaintiff a locker to change her clothes before leaving the club. Under normal circumstances, she would be in the course of her employment directly after she completed her shift when she used her locker to dress to leave the club. The night in question was no different in this regard. Plaintiff completed her shift and went to her locker to dress to leave. There is no indication that she took an unreasonable period of time to do so. The fact that Blume terminated her employment did not change the reason for her presence at the club. She worked, completed her shift, needed to change clothes, and wind up her affairs before leaving. Therefore, Plaintiff was still within the scope of her employment at the time of the injuries.

*Waiver*

{25} Plaintiff testified at her deposition that she called Blume for workers' compensation information for her doctor's billing purposes, and Blume told her that she needed to call back and speak with Reese. When she requested the information from Reese, he stated that he would give her the information after she returned to the hospital and obtained a drug test. She did so, and an emergency room doctor told her that because it was after the fact, it would be irrelevant and a waste of money. She called Reese back more than once and "[h]e kept saying that a drug test was needed, that I didn't follow procedure, and just denied me."

{26} Citing *City of Artesia v. Carter*, 94 N.M. 311, 610 P.2d 198 (Ct.App.1980), Plaintiff argues that an employer may voluntarily waive the protection of the Act and that Reese's actions constitute such a waiver. We cannot agree. *City of Artesia* has no bearing on the case on appeal. In that case, Carter performed work for the City of Artesia under contract. *See id.* at 312, 610 P.2d at 199. After the death of a Carter employee in a compensable accident, Carter paid workers' compensation to the employee's widow. *See id.* at 311–12, 610 P.2d at 198–99. The City of Artesia settled a separate wrongful death action and sued Carter to recover the settlement amount and its defense cost under its indemnity contract with Carter. *See id.* at 312, 610 P.2d at 199. This Court held that the indemnity contract was enforceable, and that the public policy of the workers' compensation laws does not preclude an employer from entering an express contract of indemnity. *See id.* at 313–14, 610 P.2d at 200–01. We stated that an employer who wishes to distribute loss by voluntarily relinquishing statutory protection of the Act is free to take such action. *See id.* at 314, 610 P.2d at 201. Nothing in *City of Artesia* pertains to the alleged waiver in this case.

{27} Plaintiff's claim is one of bad faith—that Reese and Blume, as agents of 6001, Inc., unfairly processed her workers' compensation claim, or did so in bad faith. The Act provides workers a remedy for such practices. *See* NMSA 1978, § 52–1–28.1 (1990). Because the Act provides a remedy for the wrong Plaintiff has alleged, that remedy is exclusive. *See Cruz v. Liberty Mut. Ins. Co.*, 119 N.M. 301, 305, 889 P.2d 1223, 1227 (1995) (Act provides exclusive remedy for bad-faith claims). Given the conduct of her managers, Plaintiff had the course of action available to her of filing her workers' compensation claim and asserting an additional claim under Section 52–1–28.1. 6001, Inc. did not waive the statutory provisions. We further note that 6001, Inc. maintained workers' compensation insurance as demonstrated by the affidavit of its insurance agent, submitted with its reply memorandum in support of its motion.

*Conclusion*

{28}  We affirm the district court's granting of summary judgment to 6001, Inc. We hold that the Act is the exclusive remedy for Plaintiff's injuries and that 6001, Inc. did not waive protection of the Act.

{29}  **IT IS SO ORDERED**.

BOSSON and BUSTAMANTE, JJ., concur.