2002-NMCA-060

48 P.3d 70

**Nicholas J. BERLANGIERI and Carol Berlangieri, Plaintiffs–Appellants,**

v.

**RUNNING ELK CORPORATION; Second Running Elk Corporation, d/b/a The Lodge at Chama, Defendants–Appellees.**

No. 21,807.

Court of Appeals of New Mexico.

April 9, 2002.

Certiorari Granted, No. 27,492, May 20, 2002.

See also 132 N.M. 92, 44 P.3d 538.

John R. Tiwald, Clara Ann Bowler, Albuquerque, NM, for Appellants.

Emily A. Franke, Michael P. Clemens, J. Duke Thornton, Butt, Thornton & Baehr, P.C., Wayne E. Bingham, Crider, Bingham & Hurst, P.C., Albuquerque, NM, for Appellees.

*OPINION*

ALARID, Judge.

{1} This case requires us to decide whether New Mexico courts will enforce an exculpatory agreement purporting to relieve the commercial operator of a recreational prem-

ises from liability for failure to exercise ordinary care to protect its patrons from risks of serious physical injury. We conclude that such exculpatory agreements are unenforceable because commercial operators of recreational premises are subject to a non-disclaimable duty to exercise ordinary care to protect patrons from foreseeable risks of physical injury or death.

## BACKGROUND

{2} Defendants operate The Lodge at Chama (hereafter The Lodge). The Lodge offers guests horseback riding expeditions as well as other recreational activities. On May 29, 1996, Plaintiff, Nicholas Berlangieri, and other employees of Honeywell Corporation were guests at The Lodge. Members of the group of employees expressed an interest in a horseback riding expedition. A riding expedition was arranged for the afternoon of May 29, 1996.

{3} Prior to the riding expedition, Jeri Simms, The Lodge's manager, spoke with each participant, including Plaintiff, to determine the participant's experience and ability in horseback riding. Simms concluded that Plaintiff was a novice rider. Simms explained to each guest that due to the unpredictable nature of horses, horseback riding involves certain unavoidable risks of injury. Simms gave each guest a copy of The Lodge's "Agreement for Release and Assumption of Risk" (hereafter the Release) and asked the guest to read and sign it. The Release stated:

I acknowledge that I have been informed of, and that I am otherwise aware of, the risks involved in fishing, horseback riding, hiking and shooting the sporting clays on the lands of the THE LODGE AT CHAMA. I hereby declare that I possess sufficient skills and experience in the above mentioned activities without causing injury to myself or other guests of THE LODGE AT CHAMA.

In consideration of being permitted to participate in the above mentioned activities and otherwise use the lands of THE LODGE AT CHAMA, I agree:

To use due care while engaging in the above mentioned activities on the lands of THE LODGE AT CHAMA, including, but

not limited to, each and every risk resulting from negligent acts or omissions of any other person or persons, including employees and agents of THE LODGE AT CHAMA. I further agree to exculpate and relieve THE LODGE AT CHAMA and its employees, representatives and agents from all liability for any loss, damage, or injury, whether to person or property which I may suffer while engaging in activities and/or using the lands of THE LODGE AT CHAMA all whether or not resulting from the negligent act or omission of another person or persons.

{4} As each guest signed the Release, Simms asked the guest if he or she understood the terms of the agreement. Each guest, including Plaintiff, stated that he understood. Although Plaintiff has no recollection of signing a Release, he does not dispute that his signature appears on an executed Release.

{5} In view of the inexperience of the Honeywell group, The Lodge selected gentle, easygoing horses for the trail ride. Plaintiff's horse was saddled prior to the trail ride by an experienced employee of The Lodge. This employee testified that the saddle, tack, and equipment he put on Plaintiff's horse were in good, serviceable condition and were properly positioned on the horse.

{6} During the trail ride, another guest observed Plaintiff's horse "constantly wanting to move to the head of the group and to move faster than the other horses in the group." The trail ride otherwise proceeded without incident. At the end of the ride, as the group approached the stable, Plaintiff's horse began to gallop. One eyewitness recalled that Plaintiff appeared to rotate to the right around the horse's body, "as if he was the hand of a clock moving around the center point." According to this witness, Plaintiff fell to the right side of the horse, his head and shoulder hitting the ground first. In the words of another witness: "It appeared to be a slow fall to the right, with [Plaintiff's] body continually facing forward. He remained upright in the sense that his back remained approximately straight." These two witnesses stated that Plaintiff's fall was consistent with the saddle sliding, but neither witness recalled actually observing the saddle

shift. One member of the party recalled that approximately two minutes after the fall, Plaintiff's horse did not have a saddle. However, the employee who saddled Plaintiff's horse, and who led the trail ride, recalled that after the fall, "[t]he saddle and tack were properly positioned and in good serviceable condition" and that he removed the saddle from Plaintiff's horse after assisting Plaintiff. Gay Davenport, an experienced horse trainer and riding instructor, provided an expert opinion as to the cause of the fall. Based on the eyewitness reports of the fall, Davenport concluded that "the saddle was not properly positioned and/or the cinch was not properly tightened; or this equipment failed, causing the saddle to slide sideways off the top of the horse."

{7} Plaintiff filed a "Complaint for Personal Injury Damages" alleging that Plaintiff had suffered severe injuries, including brain injury. Plaintiff alleged that his injuries were the result of Defendants' "negligence, carelessness, and recklessness." Plaintiff alleged his injuries were caused by the following acts and omissions on the part of Defendants and their employees:

A. Failure to properly install the saddle and related equipment on the horse which [Plaintiff] was riding; and/or

B. Providing saddle, equipment, or tack which defendants and their employees knew or should have known was faulty or was improperly installed.

Plaintiff alleged that he had "incurred medical bills of several hundred thousand dollars" as well as lost income "in excess of $450,000."

{8} Defendants moved for summary judgment arguing that they were not liable for Plaintiff's injuries because they were exculpated by the Release and because Plaintiff's injuries were the result of "equine activities," which under the Equine Liability Act, NMSA 1978, §§ 42–13–1 to –5 (1993, as amended through 1995) could not be the basis of liability. Plaintiff argued in response that (1) the Equine Liability Act does not bar liability for personal injuries caused by faulty tack, and (2) enforcement of the Release would violate public policy as expressed in the Equine Liability Act.

{9} The district court granted summary judgment in favor of Defendants. As to the Equine Liability Act, the district court found that "Plaintiffs have presented sufficient evidence from which a reasonable person could infer that the proximate cause of Berlangieri's fall and consequent injury was the Defendants' negligence in improperly saddling his horse, causing it to come loose and slip." The district court reasoned that:

The Plaintiffs' allegations are that the saddle and cinch on Berlangieri's horse were improperly installed, conduct which cannot reasonably be comprehended by the phrase "equine behavior." At best, Defendant[s] can establish that Berlangieri's fall occurred while he was riding a horse. In my view, there is no disputed question of fact that Berlangieri's injuries did not occur as a *result* of equine behavior even though they may have occurred *during* equine behavior. Thus, under the specific language of the Equine Liability Act, the Act offers no shelter for the Defendants.

{10} Turning to the Release, the district court, citing *Albuquerque Tire Co. v. Mountain States Tel. & Tel. Co.*, 102 N.M. 445, 697 P.2d 128 (1985), observed that "New Mexico consistently enforces signed waivers of liability in the same form as the one Berlangieri signed in this case." The district court noted, and rejected, Plaintiff's argument that enforcement of the Release would violate the public policy of New Mexico as expressed in the Equine Liability Act. The district court concluded that "no overriding public policy exists sufficient to invoke the exception to the general rule that contractual agreements which shift the risk of injury are valid and enforceable in this state."

## DISCUSSION

### 1. The Release

{11} We agree with the following statements regarding the relationship of public policy to freedom of contract:

Whether a contract is against public policy is a question of law for the court to determine from all the circumstances of each case. It is clearly to the interest of the public that persons should not be unnecessarily restricted in their freedom to make

their own contracts, and agreements therefore are not to be held void as being contrary to public policy, unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way. On the other hand the interests of the public do require that there shall be some restrictions on the freedom of persons to enter into contracts; and if an agreement binds a party to do or not to do anything, the doing or omission of which is manifestly injurious to the public interests, the courts must declare it contrary to public policy and therefore illegal and void.

IX *Cyclopedia of Law and Procedure* 483–85 (William Mack & Howard P. Nash eds.1903 (footnotes omitted)).

{12} In the district court, Plaintiff looked solely to the Equine Liability Act, NMSA 1978, §§ 42–13–1 to –5 (1993, as amended through 1995) (hereafter the ELA), as a source of public policy offsetting the principle of freedom of contract. We agree with the district court that nothing in the ELA itself suggests that the Legislature intended the ELA to alter common-law principles governing the enforcement of exculpatory agreements. Plaintiff erroneously assumes that the ELA enacted a quid pro quo by which providers or sponsors of equine activities receive limited liability as to injuries to riders occurring as the result of equine behavior, and, in return, are subjected to non-disclaimable liability to riders whose injuries were caused by one of the circumstances set out in Section 42–13–4(C). We do not read the ELA as having enacted any such quid pro quo. *Cf. Martin–Martinez v. 6001, Inc.*, 1998–NMCA–179, ¶¶ 5,6, 126 N.M. 319, 968 P.2d 1182 (characterizing exclusivity provisions of the Workers' Compensation Act as part of the quid pro quo established by the legislative balancing interests of employers and employees). The public policy underlying the ELA is the promotion of equine activities, not the protection of riders who are injured in the course of equine activities: "It is the purpose of the legislature to encourage owners, trainers, operators and promoters to sponsor or engage in equine activities by providing that no person shall recover for injuries resulting from the risks related to the behavior of equine animals while engaged in any equine activities." Section 42–13–2. Except as the ELA expressly limits liabilities, it leaves common-law rights and remedies intact, and, therefore, it is to the public policies informing the common law that we must look to determine whether the exculpatory agreement at issue in the present case is enforceable.

{13} The earliest statement by a New Mexico appellate court regarding the relationship of public policy to exculpatory agreements is found in *Southwestern Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n,* 67 N.M. 108, 353 P.2d 62 (1960). There, our Supreme Court observed "[t]he rule is well established that a provision in a contract seeking to relieve a party to the contract from liability for his own negligence is void and unenforceable, if the provision is violative of law or contrary to some rule of public policy." *Id.* Our Supreme Court went on to hold that an electric utility "cannot validly contract against its liability for negligence in the performance of a duty of public service, since such stipulation would be in contravention of public policy." *Id.* at 122, 353 P.2d at 71.

{14} Subsequent cases have held that public policy does not preclude enforcement of contractual provisions exculpating an investment advisor from liability for negligence in advising an investor to enter into a prohibited transaction, *State ex rel. Udall v. Colonial Penn Ins. Co.,* 112 N.M. 123, 812 P.2d 777 (1991); exculpating a telephone company for negligence in listing an incorrect number in a customer's yellow pages advertisement, *Albuquerque Tire Co.,* 102 N.M. 445, 697 P.2d 128; and, exculpating a bank acting as an escrow agent for negligence in terminating escrows, *Lynch v. Santa Fe Nat'l Bank,* 97 N.M. 554, 627 P.2d 1247 (Ct.App.1981). However, each of these prior cases involved transactions in which the releasor faced a risk of economic loss; no reported New Mexico case has considered whether an exculpatory agreement is effective to relieve a commercial enterprise from liability for failing to exercise ordinary care to protect a patron

from a risk of serious physical injury or death. Whether an exculpatory clause is effective to relieve a commercial enterprise from liability for failing to exercise ordinary care to protect a patron from a risk of serious physical injury or death presents a matter of first impression for New Mexico appellate courts.

{15} Exculpatory provisions, such as the Release at issue in the present case, present us with the question of whether the policies favoring freedom of contract should prevail over the policies that inform tort law. *Stanley v. Creighton Co.*, 911 P.2d 705, 706 (Colo.Ct.App.1996) (holding exculpatory agreement in residential lease to be violative of public policy and unenforceable against tenant). We are not convinced that the societal interests furthered by the law of negligence are proper subjects of a private agreement between contracting parties in situations where the releasee is engaged in a business that if not conducted in the exercise of ordinary care presents a risk of serious physical injury or death to the releasor.

{16} Our Supreme Court has identified the following policies furthered by the law of negligence:

> Our fault system of recovery ... serves the important social functions of [1] redistributing the economic burden of loss from the injured individuals on whom it originally fell, [2] deterring conduct that society regards as unreasonable or immoral, and [3] providing a vehicle by which injured victims may obtain some degree of compensation and satisfaction for wrongs committed against them and [4] by which society may give voice and form to its condemnation of the wrongdoer.

*Trujillo v. City of Albuquerque*, 110 N.M. 621, 624, 798 P.2d 571, 574 (1990), *rev'd on other grounds*, 1998–NMSC–031, 125 N.M. 721, 965 P.2d 305. Clearly, as to the second and fourth *Trujillo* factors, a private agreement cannot nullify *society's* interest in "deterring conduct that society regards as unreasonable" or deny *society* the opportunity to "give voice and form to its condemnation of the wrongdoer." *Id.* at 624, 798 P.2d at 574. The remaining *Trujillo* factors-society's interests in "redistributing the economic bur-

den of loss" and "providing a vehicle by which injured victims may obtain some degree of compensation"-are also implicated by ostensibly private agreements purporting to release claims for negligence resulting in personal injury:

> Superficially, the personal responsibility model advocated by the exculpatory agreement assumes that the person engaged in the activity bears the burdens created when he or she is injured.... Even in the case of an unmarried participant, the loss of income or ability to work can produce extreme burdens. The question then becomes, who absorbs those burdens?
>
> . . . .
>
> ... The answer to the question is that society absorbs these burdens. Specifically, a combination of private (i.e. friends and family) and public (i.e. the welfare system) assistance shoulders the weight.

Mario R. Arango & William R. Trueba, Jr., *The Sports Chamber: Exculpatory Agreements Under Pressure*, 14 U. Miami Ent. & Sports L.Rev. 1, 33 (1997). "Wholly apart from the higher humanitarian questions involved, the increased burden thus placed upon the state for charitable purposes would be, in and of itself sufficient to affect contracts of this character with a vital public interest." *Pittsburgh, C., C. & St. L. Ry. Co. v. Kinney*, 95 Ohio St. 64, 115 N.E. 505, 508 (1916) (holding void as against public policy contract purporting to release employer from liability for physical injury to employee caused by employer's negligence). The effect of the Release is to require society to subsidize Defendants' negligent operation of their business. *See Doe v. Miles Labs., Inc.*, 675 F.Supp. 1466, 1471 (D.Md.1987) (observing that in absence of tort cause of action against manufacturers of defective products "the costs or externalities are thrust upon victims or upon society through its governmental welfare programs" and that in absence of a tort cause of action society would be subsidizing polluting or defective products).

{17} Nationwide, "[e]quine activities are a popular form of recreation for an estimated *thirty million people.*" Terence J. Centner,

*The New Equine Liability Statutes,* 62 Tenn. L.Rev. 997 (1995) (emphasis added). "Riding horses may involve greater risk of fatal injury than most other sports, such as football and hockey. A study of hospital emergency room data during 1989–90 disclosed that approximately twenty percent of the total reported *121,274* horseback-related injuries were head or neck injuries." *Id.* at 998 (emphasis added and footnotes omitted). There can be no doubt that equine activities expose substantial numbers of consumers to risks of serious physical harm.

{18} Moreover, we believe that many—perhaps most—New Mexicans view participation in some sport or outdoor activity as an essential part of their lives. As cases from other jurisdiction indicate, the use of exculpatory releases by proprietors of sports and recreational facilities has become epidemic. *See generally* Randy J. Sutton, Annotation, *Validity, Construction, and Effect of Agreement Exempting Operator of Amusement Facility from Liability for Personal Injury or Death of Patron,* 54 A.L.R.5th 513 (1998). Because we doubt that there is a principled basis under New Mexico law for limiting the use of exculpatory agreements to horseback riding, a decision upholding the Release in this case will affect the legal rights of participants in many other outdoor activities and sports.

> We must decide the question presented to us upon the theory that we are not adjudicating for this particular plaintiff and defendant, but for all who may desire to take advantage of the principle which shall finally be established upon this question. . . . [W]e must fairly look, not upon the narrowest limitations which might be placed upon the effects of a decision holding such a release valid, but rather upon the possibilities for harm therefrom to the public.

*Johnson v. Fargo,* 98 A.D. 436, 90 N.Y.S. 725, 731 (1904) (refusing to enforce release absolving employer from liability for negligence resulting in personal injury to employee). While an individual release may not of itself constitute a matter of public interest, exculpatory agreements as a class present a matter of public interest. *Dalury v. S–K–I, Ltd.,* 164 Vt. 329, 670 A.2d 795, 799 (1995) (invalidating disclaimer exacted by operator of ski area; observing: that "[e]ach ticket sale may be, for some purposes, a purely private transaction. But when a substantial number of such sales take place as a result of the seller's general invitation to the public to utilize the facilities and services in question, a legitimate public interest arises.").

{19} We recognize that the clear majority of jurisdictions have upheld the type of release at issue here. In our view, these courts miss the crucial qualitative distinction between physical injury or death and damage to property or other purely economic interests. We agree with the Virginia Supreme Court that cases upholding exculpatory agreements in cases involving property damage are not controlling in cases involving releases of liability for negligence resulting in personal injury. *Hiett v. Lake Barcroft Cmty. Ass'n,* 244 Va. 191, 418 S.E.2d 894 (1992) (distinguishing between physical injury and property damage; holding release exculpating sponsor of triathalon void as against public policy); *Maucher v. Chicago, R.I. & P. Ry. Co.,* 100 Neb. 237, 159 N.W. 422 (1916) (holding exculpatory provision void as against public policy; observing that "this was not a contract for the transportation of a mere piece of inanimate freight. It was a contract for the transportation of a person in whose life and safety the state has an interest."); *see also* NMSA 1978, § 55–2–719(3) (1961) ("Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."); *Restatement (Third) of Torts: Prod. Liab.* § 18 (1997) ("Disclaimers and limitations of remedies by product sellers or other distributors, waivers by product purchasers, and other similar contractual exculpations, oral or written, do not bar or reduce otherwise valid products-liability claims against sellers or other distributors of new products for harm to persons.").

{20} The fact that a recreational activity involves some inherent risk of physical injury does not justify relieving the operators of recreational facilities of a duty of care to protect patrons against unreasonable and un-

necessary risks. *See Dalury,* 670 A.2d at 800 (refusing to enforce release relieving operator of ski resort for negligence in maintaining its premises; distinguishing between inherent risks of sport and risks that are "neither an inherent risk nor an obvious and necessary one in the sport of skiing"); Stephen D. Sugarman, *Assumption of Risk,* 31 Val. U.L.Rev. 833, 837–38 (1997) (citing baseball stadium as example of "no breach" case in which defendant has not acted unreasonably in exposing plaintiff to known risk because complete elimination of risk would be incompatible with enjoyment of game of baseball). We remain confident that jurors are capable of distinguishing between risks of injury that cannot be eliminated without depriving a sport or recreational activity of its essential character and unnecessary risks that arise as the result of the proprietor's failure to exercise due care for its patrons. *See* UJI 13–1603 NMRA 2002 ("What constitutes 'ordinary care' varies with the nature of what is being done.").

{21} We do not mean to suggest that courts should disregard a plaintiff's own role in deciding to engage in a particular activity. "Increasingly, risky recreational activities such as skydiving, rock climbing, and hang gliding are a socially acceptable means of exercising self-affirming autonomy and experiencing the sense of self-mastery that voluntary risk taking can provide." Donald P. Judges, *Of Rocks and Hard Places: The Value of Risk Choice,* 42 Emory L.J. 1, 27 (1993). A plaintiff who engages in an activity that he knows or should know is beyond his or her capabilities is subject to the defense of his or her own comparative fault.

{22} To summarize, we hold that the Release is unenforceable. Public policy imposes on commercial operators of recreational or sports facilities a *non-disclaimable* duty to exercise due care to avoid risks of physical injury to consumers. Our holding should not be understood as altering settled law enforcing releases in certain commercial settings where the releasor is subject solely to a risk of property damage or other purely economic loss.

### 2. The Equine Liability Act

{23} The ELA provides as follows:

A. No person, corporation or partnership is liable for personal injuries to or for the death of a rider that may occur as a result of the behavior of equine animals while engaged in any equine activities.

. . . .

C. Nothing in the [ELA] ... shall be construed to prevent or limit the liability of the operator, owner, trainer or promoter of an equine activity who:

(1) provided the equipment or tack, and knew or should have known that the equipment or tack was faulty and an injury was the proximate result of the faulty condition of the equipment or tack[.]

Section 42–13–4(A),(C). Equine activities include "riding an equine belonging to another." Section 42–13–3(B)(4). "[The] behavior of equine animals" includes "the propensity of an equine animal to ... bolt ... [or] be unpredictable." Section 42–13–3(C).

{24} We read Section 42–13–4(A) to create a broad grant of immunity from liability for negligence conditioned upon two circumstances: (1) the plaintiff-rider was injured while engaged in equine activities, and (2) the plaintiff's injuries were a result of equine behavior. We interpret the words "were a result of" to include the concept of proximate cause. As we read Section 42–13–4(A), equine behavior need not be the sole proximate cause of the plaintiff's injuries; a defendant obtains the benefit of the ELA's grant of immunity where equine behavior was merely one of several concurring causes of the plaintiff's injuries. *See* UJI 13–305 NMRA 2002 ("[Proximate cause] need not be the only cause, nor the last nor nearest cause.").

{25} Under Section 42–13–4(C)(1), a plaintiff may overcome the ELA's grant of immunity by establishing that (1) the defendant provided equipment or tack; (2) the equipment or tack was provided in a "faulty condition"; and (3) his injuries were "the proximate result" of the faulty condition of the equipment or tack. We recognize that in Section 42–13–4(C)(1), the Legislature refers to *"the* proximate result," while in Section

42–13–4(A), the Legislature refers to "*a result*." The Legislature's employment of the definite article "the," rather than the indefinite article "a," in Section 42–13–4(C)(1) suggests that the Legislature may have intended the exception provided by Section 42–13–4(C)(1) to apply only where faulty equipment is the *sole* proximate cause of a rider's injuries. This interpretation would significantly limit plaintiffs' recourse to Section 42–13–4(C)(1) to overcome the ELA's grant of immunity. The difficulty with this interpretation is that if faulty tack or equipment is the sole proximate cause of a rider's injury, then equine behavior is necessarily excluded as a proximate cause of the rider's injury. This interpretation results in the anomalous situation in which the exception applies only where the general rule is inapplicable.

{26} We conclude that a more sensible reading of Section 42–13–4(C)(1) is to treat the proximate cause element as paralleling that of Section 42–13–4(A). Thus, we hold that the exception provided by Section 42–13–4(C)(1) applies even if the faulty condition of equipment or tack was not the exclusive proximate cause of the rider's injuries.

{27} Lastly, we consider whether physically sound equipment or tack can be considered to be in a "faulty condition" because it has been improperly applied to or positioned on a horse. We find the terms "faulty" and "faulty condition" to be reasonably susceptible to an interpretation extending them to situations in which the fault consists of applying or positioning the equipment or tack in an unsafe manner. The ELA sacrifices the common-law rights of a class of plaintiffs-many of whom can be expected to have suffered serious physical injury as the result of the unreasonable conduct of the protected class of defendants-in order to promote equine activities. Because we view the ELA as special interest legislation and not as remedial legislation designed to correct a shortcoming in the common law, we construe ambiguous language in the ELA in favor of Plaintiff's important common-law right to recover damages for personal injury and against limited liability. Accordingly, we hold that faulty equipment or tack includes physically sound equipment or tack that has been improperly applied or positioned in an unsafe manner.

{28} Applying these principles, we reach the following conclusions about the present case. Evidence that Plaintiff's horse bolted as it approached the stable at the end of the horseback riding expedition would permit a reasonable jury to conclude that Plaintiff's injuries occurred during equine activity and were the result of equine behavior. If this were the only evidence before the district court, it properly could have granted Defendants' motion for summary judgment. The record, however, contains additional evidence. The affidavits of the two eyewitnesses to the accident describe the peculiar manner in which Plaintiff fell from his horse. One witness recalled observing Plaintiff's horse without a saddle approximately two minutes after the accident. The record also included a photograph showing another participant in the trail ride sitting on his horse. Based on these eyewitness accounts and the position of the saddle as shown in the photo of the other horse, Plaintiff's expert witness stated in her affidavit that improper positioning of the saddle too far to the rear of the horse or a failure of the saddle itself caused the saddle to slip sideways off the horse. The evidence was sufficient to support reasonable inferences that Plaintiff's injuries were the proximate result of improper saddling of Plaintiff's horse and that the employee who saddled the horse knew or should have known of the faulty positioning of the tack. This evidence creates genuine issues of material fact as to the applicability of Section 42–13–4(C)(1). We therefore affirm the district court's denial of summary judgment as to Defendants' ELA affirmative defense.

{29} We note that Defendants have requested a jury trial. To assist the parties and the district court on remand in applying our holding, we offer the following observations about jury instructions.

{30} First, the jury should be provided with instructions setting out relevant definitions contained in Section 42–13–3. The definitional instructions need not include alternatives that are not at issue. For example, in

the present case, there is no need to clutter the instructions with references to llamas, ponies, mules, donkeys, or hinnies. Second, the jury should be provided with instructions that enable it to make the findings required by the ELA. We also encourage the use of special interrogatories along the following lines:

**Question No. 1.** Did Plaintiff's injuries occur while Plaintiff was engaged in "equine activities"?

Answer: _____ (Yes or No)

If your answer is "No" proceed to Question No. [*]. Do not answer Question Nos. 2 through 5.

If your answer is "Yes," proceed to Question No. 2.

**Question No. 2.** Was "equine behavior" a proximate cause of Plaintiff's injuries and damages?

Answer: _____ (Yes or No)

If your answer is "No" proceed to Question No. [*]. Do not answer Question Nos. 3 through 5.

If your answer is "Yes," proceed to Question No. 3.

**Question No. 3.** Did Defendants provide Plaintiff with faulty tack or equipment?

Answer: _____ (Yes or No)

If your answer is "No," you are not to answer further questions. Your foreperson must sign this special verdict, which will be your verdict for Defendants and against Plaintiffs, and you will all return to open court.

If your answer is "Yes," then you must proceed to Question No. 4.

**Question No. 4.** Did Defendants know or have reason to know that they had provided Plaintiff with faulty tack or equipment?

Answer: _____ (Yes or No)

If your answer is "No," you are not to answer further questions. Your foreperson must sign this special verdict, which will be your verdict for Defendants and against Plaintiffs, and you will all return to open court.

If your answer is "Yes," then you must proceed to Question No. 5.

**Question No. 5.** Was the faulty tack or equipment provided by Defendants a proximate cause of Plaintiff's injuries and damages?

Answer: _____ (Yes or No)

If your answer is "No," you are not to answer further questions. Your foreperson must sign this special verdict, which will be your verdict for Defendants and against Plaintiffs, and you will all return to open court.

If your answer is "Yes," then you must proceed to Question No. [*].

"Question No. [*]" will be the first instruction on comparative fault. *See* UJI 13–2220 NMRA 2002, Directions for Use (setting out options available to trial court in instructing jury on comparative fault). The instructions relating to ELA issues should be grouped together and should immediately precede the instructions on comparative fault and damages.

## CONCLUSION

{31} The order of the district court granting summary judgment in favor of Defendants is reversed and this case is remanded for further proceedings leading to trial on the merits.

{32} **IT IS SO ORDERED.**

I CONCUR: CELIA FOY CASTILLO, Judge and JONATHAN B. SUTIN, Judge (dissenting).

SUTIN, Judge (dissenting).

{33} I respectfully dissent.

### I. Word Usage

{34} For convenience, I refer to one providing an opportunity to engage in recreational activity as an "operator"; an exculpatory contract clause by which an operator disclaims or absolves itself from liability for negligence that causes personal injury or death as a "release"; and an individual who chooses to engage in recreational activity as a "recreation seeker."

## II. Introductory Observations

{35} The majority holds that public policy imposes on operators a non-disclaimable duty of due care. This means no release is enforceable. Some risk of harm is inherent in most recreational activities. The level of that inherent risk varies depending on the particular activity. Recreation seekers face an enhanced level of risk of harm if the operator is negligent. Recreation is certainly beneficial to our mental and physical well-being. We can, of course, engage in recreational activities on our own. But some recreational activities can reasonably be pursued only when an operator provides or sponsors the activity.

{36} In the legal landscape on which we tread, concepts of individual freedom and independence clash with those advanced for full societal protection for people injured as a result of another's fault. Contract policy faces tort policy. Our historical acceptance in law of express assumption of risk is questioned in the face of resulting personal injury. All this, although the goal of both recreation seeker and operator is the exercise of due care by both.

{37} I disfavor the bold jump made by the majority without the issue having been tried below; without the issue having been placed before us by the parties; without the benefit of amicus curiae; without a better explanation of why we should depart from widespread, entrenched law; and without a better understanding of why the policies and law are not better addressed in our Legislature. The issue needs analysis and discussion in the nature of that which preceded and accompanied the groundbreaking cases of *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 P. 633 (1913), *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), and *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960).

## III. What Invalidating All Releases Covers and Affects

{38} The sole issue raised in the district court and on appeal is whether the New Mexico Equine Liability Act, NMSA 1978, §§ 42-13-1 to -5 (1993, as amended through 1995), expresses a public policy that is violated by the release signed by Plaintiff. Even allowing a leap over this limited issue, the next issue in line is whether the specific release can be enforced as written and under the circumstances of this case, not that reached by the majority declaring all releases in the entire commercial recreation industry to be per se against public policy and unenforceable.

{39} The majority's all-inclusive determination spreads through the entire spectrum of the recreation provider industry, from small individual operators to high revenue corporate operators. Its determination covers every "commercial" shoestring as well as large scale individuals and organizations providing or sponsoring horseback riding, hunting, scuba diving, river rafting, backpacking (with or without pack horses), walking, swimming, running, bicycling, bungee-jumping, hang gliding, mountaineering, snowmobiling, indoor and outdoor rock climbing, weight training, parachuting, cross-country skiing, downhill skiing, flying, and race car driving. It covers resort, ranch, and health club operators who provide any recreational activity. It covers individuals and organizations who teach, train, and instruct in safety, as well as individuals and organizations who provide the means to engage in a recreational activity. The majority makes no distinction as to level of risk of harm. It makes no distinction as to conduct comprising the lack of ordinary care.

{40} The majority opinion does not define "commercial." The holding is presumably meant to apply to operators engaged in commerce, which includes non-profit entities. If by "commerce" the majority means for-profit operators only, the majority nowhere explains why a distinction should be made between non-profit and for-profit operators. If the fault-based public policy asserted by the majority is as strong as the majority contends, such a distinction, if intended, is unwarranted.

## IV. The Status of the Law

{41} The majority joins a very small and static minority. The majority recognizes that "the clear majority of jurisdictions have

upheld the type of release at issue here." Majority Opinion ¶ 19. The growth of the common law throughout the country has resulted in the widespread general rule that releases are enforceable. Few jurisdictions, and no recent legal commentary that I have seen, have bought into the absolute, end of the spectrum view taken by the majority as a solution to the concerns about releases. Rather, settled exceptions to the general rule have evolved over time.

{42} Exceptions were carved out when a release violated law or public policy. Public policy exceptions have been applied to releases protecting employers, manufacturers and suppliers in strict products liability, innkeepers, warehousemen, public utilities, common carriers, banks, and hospitals. An exception exists when a state legislature has enacted legislation regulating safety and allocating responsibility with respect to a particular activity. But the general rule nevertheless remains the rule and it has been, and can continue to be, applied on a case-by-case basis. The majority replaces the general rule with a general rule that no operator release is valid, likely setting us on a course of carving out exceptions on a case-by-case basis to this new general rule.

{43} The American Law Institute had every opportunity to significantly change Section 496B (allowing express assumption of risk) in the Second Restatement when it adopted Section 2 in the Third Restatement. Section 496B read: "A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy." Restatement (Second) of Torts § 496B (1964). Recently amended, the Restatement now reads:

When permitted by contract law, substantive law governing the claim, and applicable rules of construction, a contract between the plaintiff and another person absolving the person from liability for future harm bars the plaintiff's recovery from that person for the harm. Unlike a plaintiff's negligence, a valid contractual limitation on liability does not provide an occasion for the factfinder to assign a percentage of responsibility to any party or other person.

Restatement (Third) of Torts § 2 (1999). Comment b to this section reads:

Rationale and effect. In appropriate situations, the parties to a transaction should be able to agree which of them should bear the risk of injury, even when the injury is caused by a party's legally culpable conduct. That policy is not altered or undermined by the adoption of comparative responsibility. Consequently, a valid contractual limitation on liability, within its terms, creates an absolute bar to a plaintiff's recovery from the other party to the contract.

*Id.,* cmt. b. We view "[t]he Restatement of Torts [to be] persuasive authority entitled to great weight." *Moore v. Burn Constr. Co.,* 98 N.M. 190, 193, 646 P.2d 1254, 1257 (Ct. App.1982). Restatement (Second) of Contracts § 195(2), (3) (1979) reads:

(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

(c) the other party is similarly a member of a class protected against the class to which the first party belongs.

(3) A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.

Comment a (rationale) to the Restatement (Second) of Contracts reads: "The law of torts imposes standards of conduct for the protection of others against unreasonable risk of harm.... [A] party to a contract can ordinarily exempt himself from liability for harm caused by his failure to observe the standard of reasonable care imposed by the

law of negligence." *Id.,* cmt. a (citations omitted).

{44} A recent American Law Reports (ALR) annotation, which appears to be the broadest annotation on releases, concludes:

> A release signed by a patron exempting the owner or operator of [a] ... facility from liability may be enforceable provided that the form and language of the release are in a form which is conspicuous, legible, and recognizable by a reasonable person as a release from liability.

Randy J. Sutton, Annotation, *Validity, Construction, and Effect of Agreement Exempting Operator of Amusement Facility From Liability for Personal Injury or Death of Patron,* 54 A.L.R.5th 513 (1998). This ALR also states:

> In general, courts have enforced exculpatory agreements between proprietors ... and their patrons, so long as there is no statutory prohibition against such clauses, the facility is not providing an essential or public service, and there is not a great deal of disparity in bargaining power between the sellers and buyers ... as is the case in so-called adhesion contracts.

*Id.*

{45} American Jurisprudence's recent Proof of Facts on "Avoiding the Effect of a Recreational Activity Liability Release" states "[r]eleases of liability in favor of a recreational activity operator are generally enforceable, as it is proper for a participant and the operator to expressly agree in advance that the operator will not be liable for its negligence." 33 Am.Jur.3d *Proof of Facts* § 421 (1995).

{46} Current law review article authors recommend that various issues relating to releases be addressed and reforms be implemented, but none among the many I reviewed recommends completely scuttling the traditional general rule. *See, e.g.,* Mario R. Arango & William R. Trueba, Jr., *The Sports Chamber: Exculpatory Agreements Under Pressure,* 14 U. Miami Ent. & Sports L.Rev. 1 (1997).

{47} The bulk of the case law today enforces operator releases, subject to exceptions. *See, e.g., Brooks v. Timberline,* 127 F.3d 1273, 1274–75 (10th Cir.1997) (applying Colorado law, snowmobiling); *Street v. Darwin Ranch, Inc.,* 75 F.Supp.2d 1296, 1299 (D.Wyo.1999) (horseback riding); *Moore v. Hartley Motors, Inc.,* 36 P.3d 628, 631–32 (Alaska 2001) (all-terrain vehicle); *Jones v. Dressel,* 623 P.2d 370, 375–76 (Colo.1981) (*en banc* ) (parachute jumping); *Lee v. Sun Valley Co.,* 107 Idaho 976, 695 P.2d 361, 363 (1984) (horseback riding); *Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council,* 416 Mass. 286, 620 N.E.2d 784, 786 (1993) (motorcycle safety course); *Moss v. Fortune,* 207 Tenn. 426, 340 S.W.2d 902, 903–04 (1960) (horseback riding); *Murphy v. N. Am. River Runners, Inc.,* 186 W.Va. 310, 412 S.E.2d 504, 508–09 (1991) (whitewater rafting); *Milligan v. Big Valley Corp.,* 754 P.2d 1063, 1066 (Wyo.1988) (ski racing at resort); *Williams v. Cox Enters., Inc.,* 159 Ga.App. 333, 283 S.E.2d 367, 369 (1981); *Marshall v. Blue Springs Corp.,* 641 N.E.2d 92, 95 (Ind.Ct. App.1994) (scuba diver slip and fall on dock); *Dombrowski v. City of Omer,* 199 Mich.App. 705, 502 N.W.2d 707, 709 (1993) (crossing river while hanging from rope stretched across river); *Swartzentruber v. Wee-K Corp.,* 117 Ohio App.3d 420, 690 N.E.2d 941, 945 (1997) (horseback riding); *Mann v. Wetter,* 100 Or.App. 184, 785 P.2d 1064, 1066 (1990) (*in banc* ) (scuba diving); *Boyce v. West,* 71 Wash.App. 657, 862 P.2d 592, 596 (1993) (scuba diving).

{48} The majority relies on four cases that invalidate releases. One was decided in 1904, another in 1916. One of these involved an employer-employee relationship, the other the railroad transportation of freight. Majority Opinion ¶¶ 18, 19. The two other cases involved operator releases and were premises liability oriented. In *Dalury v. S–K–I, Ltd.,* 164 Vt. 329, 670 A.2d 795 (1995), a skier collided with a metal pole on a ski run. *Dalury* does not outlaw, on a blanket basis, all releases in the recreation industry. The court in *Dalury* recognized the wisdom considering various factors "as relevant considerations" in determining the validity of a release. *Id.* at 798. Further, *Dalury* concludes that the proper formula is a " 'determination of what constitutes the public interest [while] considering the totali-

ty of circumstances of any given case against the backdrop of current societal expectations.' " *Id.* (quoting *Wolf v. Ford*, 335 Md. 525, 644 A.2d 522, 527 (1994) (discussing the various factors set out in the widely-cited case *Tunkl v. Regents of the Univ. of Cal.*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963) (*in bank* ))).

{49} The other, *Hiett v. Lake Barcroft Cmty. Ass'n*, 244 Va. 191, 418 S.E.2d 894 (1992), involved a triathlon sponsored by a community association where the participant hit his head on a rock when starting the swim portion of the event. *Hiett* simply followed a sleeping 1890 precedent that had not been modified or altered. *Id.* at 897. The 1890 precedent did not involve recreational activity, but rather an agreement between a railroad company and its employee that specified the railroad would not be liable for injuries or death sustained by its employees occurring from any cause whatsoever. *Id.* at 896.

{50} The overwhelming case law today and for years on end has refused to hold releases per se invalid. *See, e.g., Marshall*, 641 N.E.2d at 95 ("[I]t is not against public policy to enter into an agreement which exculpates one from the consequences of his own negligence."); *Cormier*, 620 N.E.2d at 786 (holding the allocation of risk by agreement is not against public policy); *Dombrowski*, 502 N.W.2d at 709 ("[I]t is not contrary to this state's public policy for a party to contract against liability for damages caused by ordinary negligence."); *Swartzentruber*, 690 N.E.2d at 945 (holding exculpatory contracts that bar an action in negligence are not *per se* void as against public policy).

## V. Rationale and Policy

{51} The driving force behind the majority's holding is that as long as releases are enforceable the public must ultimately pick up the tab for the harm and at the same time subsidize an operator's negligence. Majority Opinion ¶ 16. From information obtained from a law review article, the majority states equine activities involve thirty million people and result in tens of thousands of head and neck injuries. Majority Opinion ¶ 17. But we have no idea how many equine related injuries are due to the behavior of equine animals for which operators are immune under New Mexico's Equine Liability Act. *See* § 42–13–4(A). The majority perceives an "epidemic" use of releases. Majority Opinion ¶ 18. But we have before us no study of the use of releases in the New Mexico recreation industry, the number of people in New Mexico affected by the use of releases, and the extent of injuries received due to New Mexico operator negligence.

{52} Nor have we any information on the extent to which a recreation seeker's own health insurance will pay for medical expenses from a recreational activity injury. Since the majority is not concerned with releases barring liability for economic damages, the risk-taker's loss of wages should be irrelevant. This leaves damages for pain and suffering, which is not necessarily on the public's tab. Also missing is any analysis of economic considerations such as cost of operator insurance, risk of business failure due to higher pricing in order to pay for operator insurance, and overall effect on the New Mexico economy. Further, we should not assume that operators are any less likely with a release than with insurance coverage to concentrate on the use of ordinary care.

{53} No credence is given to the extent New Mexico citizens value recreational activity and seek adventure, competition, and independence, and to the physical and mental health achieved through such activity, regardless of releases. If the existence or not of releases makes a difference, recreation seekers might prefer the availability of more activities with releases than fewer without releases. The majority does not recognize the citizen's choice to knowingly and voluntarily engage in recreational activities of their choosing and to assume the risk of and responsibility for the harm that may result.

{54} Granted, past views about "freedom of contract" and of assumption of risk have sometimes given way to policies underlying our fault system of recovery. From careful and studied analyses of law and economics, and based on contemporary community standards of morality and right conduct, courts may deem it appropriate to dramatically change the course of the law as occurred, for

example, with the adoption of strict products liability. But the general rule permitting releases based on express assumption of risk, while appropriately limited by well-developed exceptions, has not outlived all beneficial life when applied to the recreation industry. The court can still effectively apply public policy and contract validity analyses as each case arises. I see no pressing need to replace the traditional and long-accepted analysis with a blanket outlawing of releases as *malum in se*.

{55} A vehicle has just driven over New Mexico's express assumption of risk doctrine rendering the doctrine road kill. It has done so by holding "the policies that inform tort law" to be a copyright that cannot be infringed by contract. The day before the filing of the majority's decision express assumption of risk was alive. *See Thompson v. Ruidoso–Sunland, Inc.*, 105 N.M. 487, 492, 734 P.2d 267, 272 (Ct.App.1987) (indicating the concept of express assumption of risk still exists in New Mexico). Releases relating to negligence were, and apparently still are, valid when only economic damages are at stake. *See State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 126, 812 P.2d 777, 780 (1991) (implicitly validating release as to negligence in professional services contract and affirming the "countervailing public policy consideration—the freedom to contract"); *Omni Aviation Managers, Inc. v. Buckley*, 97 N.M. 477, 479, 641 P.2d 508, 510 (1982) (stating "an ordinary bailee ... may limit or disclaim his liability for his own negligence by so providing in the contract of bailment"); *Lynch v. Santa Fe Nat'l Bank*, 97 N.M. 554, 556, 560, 627 P.2d 1247, 1249, 1253 (Ct.App. 1981) (upholding release in escrow agreement against liability for negligence in terminating escrows). *Lynch* actually relied in its analysis on the widely followed if not leading *Tunkl* case, which involved the validity of a release asserted by a hospital to bar damages for personal injury.

{56} The majority places negligence in recreational activity in the same category as strict products liability presumably based in part on underlying rationale that the cost of injury to consumers of services, just as with the consumers of products, should be borne by the industry through the purchase of insurance. This thinking, of course, can apply to every business in every industry. The majority has chosen the recreation provider industry. While one of the underlying bases for negligence liability may be "the important social functions of redistributing the economic burden of loss from injured individuals on whom it originally fell," *Trujillo v. City of Albuquerque*, 110 N.M. 621, 624, 798 P.2d 571, 574 (1990), *rev'd on other grounds*, 1998–NMSC–031, 125 N.M. 721, 965 P.2d 305, I disagree with the majority's view that this, like the area of strict products liability, *see Henningsen*, 161 A.2d at 94–95 and Restatement (Third) of Torts, Products Liability, § 18 (1997), provides a basis on which to automatically refuse to enforce any release in the entire recreation provider industry. Strict liability is distinct from negligence. Breach is imputed as a matter of law; breach is not based on foreseeability. *See Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 402, 827 P.2d 102, 117 (1992). A defective product line presents a considerably different risk to the public in New Mexico than an operator's employee who may fail on occasion to exercise due care. Recreational services in New Mexico are not of the same significance and proportion as products which, when manufactured, are of a "nature of a thing ... such that it is reasonably certain to place life and limb in peril when negligently made, [becoming] a thing of danger," *MacPherson*, 111 N.E. at 1053, thereby requiring this Court to completely undo express assumption of risk and have negligence doctrine fettered only by comparative negligence law.

{57} The majority places public policy exclusively within existing tort law ignoring public policy in contract law. Yet "every law is an expression of a state's public policy." *Reagan v. McGee Drilling Corp.*, 1997–NMCA–014, ¶ 9, 123 N.M. 68, 933 P.2d 867 (1997). The majority says the policies that "inform" our fault system of recovery should prevail over policies that "inform" the contract law of assumption of risk. Yet one can validly argue "exculpatory provisions should be enforced by society because the person releasing another from the consequence of his own negligence, has promised to do so." Donald E. Lowrey, *Shielding Against Fu-*

*ture Negligence Liability: The Role of Exculpatory Contract Provisions in Personal Injury Actions,* 12 W. St. L.Rev. 819, 834 (1985). "Releases, being contractual in nature, are governed by the laws of contracts generally, as well as any specific legislative acts prescribing the manner by which such agreements may be validated." *Ratzlaff v. Seven Bar Flying Serv., Inc.,* 98 N.M. 159, 162, 646 P.2d 586, 589 (Ct.App.1982). The public policy that the majority places in second position is the preservation of contract and express assumption of risk permitting adults to knowingly and voluntarily contract in a manner in which risks are understood and assumed and a right to sue thereby given up. The concept of "freedom to contract" has not by any means been eliminated in New Mexico. *See Colonial Penn Ins. Co.,* 112 N.M. at 126, 130, 812 P.2d at 780, 784 (affirming New Mexico public policy of freedom to contract); *see also, e.g., Adams v. Roark,* 686 S.W.2d 73, 75 (Tenn.1985) (stating "the case law and announced public policy of Tennessee favors freedom to contract against liability for negligence").

{58} Several states have enacted legislation pursuant to which the courts have invalidated releases as violative of the state's public policy as set by that state's legislature. *See, e.g., Lee,* 695 P.2d at 363; *Murphy,* 412 S.E.2d at 508–09; *Milligan,* 754 P.2d at 1066. Our Legislature has entered the arena by declaring certain agreements to indemnify for one's own negligence to be against public policy and void. *See* NMSA 1978, §§ 56–7–1 (1971), –2 (1999); *see also Guitard v. Gulf Oil Co.,* 100 N.M. 358, 361–62, 670 P.2d 969, 972–73 (Ct.App.1983) (analyzing validity of agreement to indemnify a party for its own negligence under Section 56–7–2(A) and holding indemnification agreement void and unenforceable under statute as to liability for indemnitee's percentage of negligence).

{59} If our Legislature wants to modify the common law to invalidate operator releases in a particular recreational activity or across the board, it presumably can. If the Legislature wants to regulate recreational activity, set safety standards for operators, and establish a public safety policy to which releases would be antithetical, the Legisla-

ture can enact such legislation. Note that the Legislature has enacted laws regarding liability in the equine and ski industries. *See* The New Mexico Ski Safety Act, NMSA 1978, §§ 24–15–1 to –14 (1969, as amended through 1997), and the Equine Liability Act, §§ 42–13–1 to –5. Note, too, our Supreme Court has placed in the realm of the Legislature the issue whether the common law rule that there is no duty to wear seat belts should be overturned with a common law duty to do so, the failure of which would subject a plaintiff to the application of the comparative negligence doctrine. *Thomas v. Henson,* 102 N.M. 326, 327, 695 P.2d 476, 477 (1985); *Norwest Bank New Mexico, N.A. v. Chrysler Corp.,* 1999–NMCA–070, ¶¶ 25, 28, 127 N.M. 397, 981 P.2d 1215.

{60} The majority opinion finds its primary legitimacy in language quoted from *Trujillo,* 110 N.M. at 624, 798 P.2d at 574. Majority Opinion ¶ 16. The language says our fault system of recovery serves certain important social functions. *Trujillo* was a car accident case in which the plaintiff attacked the Tort Claims Act liability cap. *Id.* at 623, 798 P.2d at 573. The *Trujillo* Court's museful statement about the tort system was in the context of the Legislature-imposed cap on damages and the level of scrutiny to employ in determining the constitutionality of the legislation. *Id.* at 624–25, 798 P.2d at 574–75. Interestingly, the *Trujillo* Court mentions "[t]he debate over the policy question of whether the tort system is the best mechanism for performing the functions currently allocated to it," and stated "[i]t is entirely appropriate that policy choices flowing from such debate take place in the legislative sphere." *Id. Trujillo,* its context, and its language quoted by the majority, should not instruct the outcome here. Words expressed in one context grafted for use as the bedrock rationale in a completely different context requires a more reasoned application than that found in the majority opinion. *Trujillo*'s language does not provide a basis for the majority's holding.

{61} Absent violation of a public policy set by the Legislature or the existence of a recognized exception, the enforceability of a release ought to be measured on a case-by-

case basis considering the circumstances of the case as a whole. Courts should examine whether a release contains clearly expressed, conspicuous language by which the recreation seeker (1) will understand the risks of injury or death; (2) will understand that he is releasing and giving up the right to sue the operator for damages for personal injuries received as a result of the operator's and its employee's negligence in providing the recreational activity, including faulty advice or instruction, improperly maintained or secured equipment, and dangerous premises; (3) is unequivocally told that by signing the release he nevertheless agrees to assume the risk of harm and the financial cost accompanying the harm and agrees not to sue or otherwise look to the operator for any type of damages, including medical expenses and economic damages such as lost wages, as well as damages for pain and suffering; and (4) is unequivocally told he should not and cannot rely on or expect any liability insurance to cover injuries that he may suffer due to the operator's negligence. These requirements constitute fair notice and fair play.

{62} At the same time, releases are not favored and courts should strictly construe releases against the party seeking to enforce them. *See, e.g., Bothell v. Two Point Acres, Inc.,* 192 Ariz. 313, 965 P.2d 47, 51 (App. 1998); *Swartzentruber,* 690 N.E.2d at 945 (holding releases "are not *per se* void as against public policy," but "are not particularly favored in the law" and are to be strictly construed). This is particularly true in examining the legal validity of a release. The traditional, longstanding contract concepts of unconscionability, adhesion, oppression or coercion, misrepresentation, fair notice, and violation of public policy should continue to play an important role in that scrutiny. Included, too, should be appropriate concerns about the opportunity given to the recreation seeker to read the release and discuss the release and any safety concerns with the operator; the clarity of the scope of the release; the extent of the notice of the physical and legal risks the patron is assuming; and the reasonable and objective expectation from reading the release that the operator is under no obligation to exercise ordinary care in regard to any aspect of the activity. In considering the circumstances, the factors such as those in *Tunkl,* which are set out in *Lynch,* can be considered. *See Lynch,* 97 N.M. at 558–59, 627 P.2d at 1251–52.

{63} Fair and adequate notice and warning by the operator must go hand in hand with the recreation seeker's assumption of risk. Both ends must be examined: What and how clearly the operator tells the recreation seeker about physical and legal risks and whether that goes as far as it should, and the extent to which the recreation seeker has a reasonable opportunity to read the release and make an informed and unequivocally expressed decision to assume such risks.

{64} Courts will forever be tested when someone receives a devastating injury, and perhaps by its holding the majority hopes to avoid having to face each such test. However, the general rule, properly defined and applied, permits a reasonable balance of risk assumption and tort/fault interests.

## VI. The Statutory Construction

{65} I cannot join in the majority's engagement in statutory construction to resolve what it sees as an "anomolous situation" relating to proximate cause, and as a lack of clarity in the meaning of "faulty condition," in the Equine Liability Act. *See* Majority Opinion ¶¶ 23–27. These statutory construction issues were not raised below or on appeal. Furthermore, the analyses and holdings are not essential to the majority's affirmance of the district court's denial of Defendants' motion for summary judgment.

{66} The district court held as a matter of law that Plaintiff's injury did not occur as a result of equine behavior. The court therefore denied Defendants' motion for summary judgment under the Equine Liability Act. Defendants sought Rule 12–201(C) review in this Court on the ground that none of the exceptions to immunity applied because the undisputed evidence showed the injury resulted from equine behavior only. Plaintiff responded, arguing that material issues of fact existed as to Defendants' negligence, and also that Defendants failed to provide sufficient evidence for a jury determination of

whether the injury resulted from equine be-havior.

{67} Contrary to the district court's determination that the injury did not result from equine behavior, and also contrary to Defendants' contention that the injury resulted solely from equine behavior, the majority has determined that an issue of fact exists regarding whether the injury resulted from equine behavior. Majority Opinion ¶ 28. This ruling, and the ruling that an issue of fact exists as to operator negligence, are enough to affirm the district court's denial of Defendants' motion for summary judgment.

{68} The statutory construction issues of proximate cause and faulty condition not having been raised or addressed below or on appeal, and the issues not being necessary for any of the majority's holdings on appeal, the issues should lay at rest until the circumstances arise for district court adjudication and presentation of the specific issues on appeal to this Court.

### VII.  The Instructions

{69} Because the issues that are the subject matter of the jury instructions the majority suggests on remand, Majority Opinion ¶ 30, are those not raised or addressed below or on appeal, I respectfully think we should, under the circumstances, leave the first draft of the instructions to the parties and the district court.

### VIII.  The Issue of the Equine Liability Act as Expressing Public Policy

{70} The majority does pause to say that the Equine Liability Act does not express a public policy making the release in this case unenforceable.  I agree with that statement, and I would affirm the district court's summary judgment.  Of course, the majority's ultimate holding makes this issue irrelevant. That is why the majority understandably devotes but a paragraph to rationale, Majority Opinion ¶ 12, and why I devote only one paragraph to my agreement with the majority on the issue.

### IX.  Conclusion

{71} For the reasons set forth above, I respectfully dissent.